IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK KEEL<br>P.O. Box 335<br>Spring House, PA 19477 | : Civil Action<br>: No. _____ |
| and | : |
| KEEL COMMUNICATIONS, LLC<br>P.O. Box 335<br>Spring House, PA 19477 | : Jury Trial Demanded |
| *Plaintiffs,*<br>v. | : |
| DAVID AXELROD<br>730 North Franklin Street, Suite 404<br>Chicago, Illinois 60656, | : |
| and | : |
| PENGUIN RANDOM HOUSE, LLC<br>1745 Broadway<br>New York, New York 10019, | : |
| *Defendants.* | : |

## COMPLAINT

Plaintiffs Frank Keel and Keel Communications, Inc., by their undersigned counsel, Bochetto & Lentz, P.C., bring the following Complaint against David Axelrod, and Penguin Random House, LLC.

## *Introduction*

1.    Frank Keel has worked his entire adult life to establish a reputation as a tough, no nonsense public relations specialist, who is at his best in the midst of a public relations crisis, utilizing his crisp, blunt style to interact with the media.

2.    While Keel has been directly involved in and managed many public crises on behalf of political campaigns and public figures, he is perhaps best known in Pennsylvania's political and public relation circles as the "father" of the "Republicans Did It" strategy, employed by Keel while providing crisis management services to the reelection campaign of Philadelphia Mayor John Street in October 2003, immediately after an FBI "bug" was discovered in Mayor Street's City Hall Office.

3.    The FBI "bug" instantaneously became a national media story which threatened to derail an already vulnerable reelection bid by Mayor Street against a formidable Republican challenger, Sam Katz.

4.    The "Republicans Did It" public relations campaign launched by Keel was a resounding success – Street's Democratic base became energized, and other Democratic groups began questioning the timing of planting an FBI "bug" in the Democratic Mayor's office during a hotly contested campaign.

5.    Despite the FBI "bug" crisis, Keel's crisis management services turned the tide of the election and ultimately lead to a landslide Street victory.

6.    Street's victory in 2003 and Keel's crisis management services during the FBI bug crisis became a defining moment for Keel's career:   his brazen and

successful handling of the crisis launched Keel to the forefront of his profession as he immediately became known as the "father" of the "Republicans Did It" campaign strategy that won Street reelection.

7.    Keel's watershed career moment, however, was taken from him by David Axelrod (another public relation specialist) through Axelrod's recent *New York Time's* Best Selling Book*, Believer – My Forty Years in Politics*, wherein Axelrod fabricated a story claiming he (and not Keel) provided the critically important "Republicans Did It" crisis management services to the Street campaign.

8.    In *Believer*, Axelrod directly states he learned about the "bug" from a Street campaign advisor the day it was discovered, and immediately provided the advice and public relation services that Keel actually provided.

9.    Contrary to Axelrod's account, it was Frank Keel's crisis management services that game changed the 2003 Philadelphia mayoral election. It was unquestionably Keel, and not Axelrod, who was centrally responsible for implementing the strategy. Indeed, Axelrod, who was in Chicago during the critical time period, initially opposed Keel's strategy – until events quickly demonstrated Keel's strategy was working.

## *Jurisdiction & Venue*

10.   This Court has original jurisdiction of Plaintiffs' Lanham Act claims under 15 U.S.C. § 1121 and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law unfair competition claims.

11.   Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims

occurred within the geographical region embraced by the Eastern District of Pennsylvania.

## *The Parties*

12.  Plaintiff Frank Keel is a political and media consultant and crisis manager who provides services to political candidates, government and business entities, and trade unions. Keel's office mailing address is at P.O. Box 335, Spring House, Pennsylvania 19477.

13.  Plaintiff Keel Communications, Inc. is a full-service political media consulting and public relations firm having its office mailing address at P.O. Box 335, Spring House, Pennsylvania 19477.

14.  Defendant David Axelrod is a campaign and media strategist for Democratic candidates seeking public office at the national, state, and local levels, and purports also to render crisis management. Axelrod has an office at 730 North Franklin Street, Chicago, Illinois 60656.

15.  Defendant Penguin Random House, LLC is an international publishing firm with its United States headquarters located at 1745 Broadway, New York, New York 10019.

16.  On information and belief, at all times material hereto, Penguin controlled Axelrod's drafting, revision, and editing of *Believer* such that Axelrod was acting as Penguin's authorized agent and/or employee, thereby making Penguin vicariously liable for all of Axelrod's wrongful conduct as set forth fully herein.

## *Factual Background*

17.  Since the early 1990s, Keel has earned the reputation as a tough talking, blunt, hard hitting intellect in his capacity as a spokesman, media advisor, and crisis manager to dozens of Democratic officials and candidates throughout the Commonwealth of Pennsylvania and elsewhere. Much of Keel's success has flowed directly from services, including crisis management services, he provided to Philadelphia Mayor John F. Street in his hotly contested 2003 reelection campaign against Republican challenger Sam Katz.

18.  Keel has been widely chronicled for the lifetime of services he has provided, and has uniformly been described as decisive, ballsy, smart, foul-mouthed, innovative, and fearless. By way of example only, long-time acclaimed investigative reporter Ken Dilanian wrote in 2002:

> Tall and white-haired, Keel, 43, is built like a power forward, and he acted like one recently when he planted himself forcefully between the mayor and a reporter who was trying to question Street about a flap over his campaign expenses.
>
> Keel and the reporter later laughed about the episode, which said a lot. Keel has engendered some goodwill among the press corps because he projects qualities that Street, in his dealings with journalists, often does not-including respect, humor and candor.
>
> ****
>
> Added George Burrell, Street's top political aide: 'He has done a great job at being persistent and following up and articulating to the mayor the value of the specific news-media opportunities.'

[**Exhibit "1"** – philly.com (pub. Apr. 22, 2002)].

19. Keel and Keel Communications directly compete with Axelrod for prospective clients. Indeed, as set forth in detail below, both Keel and Axelrod provided services to Mayor John F. Street's 2003 reelection campaign for the Office of the Mayor of the City of Philadelphia, Pennsylvania.

### *Philadelphia's 2003 Mayoral Race*

20. As was typical in Philadelphia politics, the 2003 Mayoral election's outcome was extremely close, with poll results just weeks before the election showing Katz cutting deeply into Mayor Street's small margin (if not leading, according to some polls).

21. By early October 2003, given these ambiguous and quickly changing polling numbers, the election's outcome was far from decided. Indeed, in 1999 Mayor Street had defeated Katz by only 9,000 votes, which represented a mere 2% margin.

22. On Tuesday, October 7, 2003, at approximately 7:00 a.m., Philadelphia Police Department technicians uncovered a listening device (a "bug") planted in the Mayor's City Hall Office.

23. Later that afternoon on October 7th, unnamed federal sources began leaking to the media that the FBI had planted the bug as part of an ongoing federal investigation into City Hall corruption. [**Exhibit "2"** – *Philadelphia Citypaper* at pp. 2-3 (pub. Oct. 13, 2003)].

24. With local and national media demanding an immediate explanation, Mayor Street held an impromptu press conference on October 7th (but only published later on October 8th) admitting he had no idea who had planted the bug.

Describing the bug's discovery as "a huge matter of concern," Mayor Street was plainly on the defensive:

> The question that ultimately will get raised in the minds of some people is who's investigating the Mayor's office? ... Well, in response to that question, I want to assure the people of this city that this Mayor is not being investigated. I have done nothing wrong.

[**Exhibit "3"** – www.philly.com (pub. 10/08/03)].

### *Keel's services to Mayor John's Street's reelection campaign and their critical role in Mayor Street's November Reelection*

25.  That evening many of Mayor Street's advisors and campaign staff met to address the resulting crisis and its potentially fatal impact on the Mayor's reelection chances. The campaign was in a state of turmoil.

26.  As part of the consulting services he was providing to Mayor Street's campaign, and with the U.S. Attorney's Office's confirmation of the bug's federal origin, Keel developed and advocated that Mayor Street's campaign publicly announce that the bug was part of a "Republican dirty-tricks" strategy.

27.  As part of his consulting services, Keel further advocated that the campaign publically describe the bug as originating at the highest levels of the Bush Administration and designed to put a Republican Mayor in City Hall and potentially swing both Philadelphia and Pennsylvania in the 2004 presidential election to President Bush. [**Exhibit "2"** – *Citypaper* at p. 3; **Exhibit "4"** – *Philadelphia Weekly* at p. 1 (pub. Dec 3, 2003)].

28.  On the morning of October 8, 2003, Keel arrived at an event held by the Guardian Civic League (a civic association of Philadelphia's African-American

Police Officers) to formally endorse Mayor Street. Keel's attendance at the League's event was in connection with the services he was providing to Mayor Street's reelection campaign.

29.  Because the League's President had been unexpectedly hospitalized the evening before and could not attend, the event was called off and his advance team notified the Mayor that he should not travel to the site.

30.  Keel, who was already on site in addition to the advance team, noticed an unusually large media throng waiting on the sidewalk for the Mayor's arrival. Keel knew that the media was more interested in questioning the Mayor about the bug than in the League's endorsement.

31.  Keel immediately called Shawn Fordham, the Mayor's Campaign Manager, to explain the situation: "there are 25 or 30 reporters outside on the sidewalk. If I walk out there and tell them the event's cancelled due to the endorser's illness, they're not going to believe it. They're going to think the Mayor's in hiding, that he's scared to death of the bug."

32.  Requesting authorization to implement the "Republicans did it" strategy he advocated the evening before, Keel told Fordham in effect:

> Let me go out there and tell the press that the campaign has reason to believe that the national Republican Party could be behind the bug. Attorney General John Ashcroft was notorious for his Republican partisanship and ruthless brand of politics. President Bush had visited Philadelphia more than any other city in the country outside his native state of Texas. And the national Republican Party had made it abundantly clear that winning Pennsylvania was critical to Bush's reelection

> hopes the following year. As the State's only City of the
> First Class, as Philadelphia goes, so goes Pennsylvania.
> Let me package all of this circumstantial evidence and
> suggest to the press that it's not beyond the realm of
> possibility for the national Republican Party to have
> planted the bug in the Mayor's office.

33. After several minutes' consideration, Fordham gave Keel the go-ahead to implement the strategy – but with an unequivocal warning. "Do it," Fordham said, "but if it went bad I would apologize for him later," *i.e*, that it would be Keel who gets thrown under the proverbial bus.

34. Accepting that the strategy could backfire, Keel walked out to face the media and told them just what he had told Fordham moments earlier. When a reporter asked if he had any evidence to support his charges, Keel responded: "Did you ever hear of Watergate?"

35. Fordham states: "Frank was fantastic. From that moment of [Keel's statements outside the Civic League building], he was the lead in our effort to fight back 'the bug.' He was the first out front and stayed there." [**Exhibit "5"** – Shawn Fordham Statement)].

36. As well-documented in contemporaneous media coverage (and as captured on film excerpts appearing in the acclaimed documentary *The Shame of a City*), Keel explained: "Do we believe that the Republican Party, both at the federal and state level, is pulling out every stop to get Pennsylvania in 2004? ... Absolutely. Is the Republican Party capable of dirty tricks? I think that is well documented." [**Exhibit "4"** – *Philadelphia Weekly* at p. 2]. Keel elaborated:

> What the campaign does find incredibly curious is that
> the FBI could so quickly leap to the conclusion that this
> was not related to the mayoral campaign in any way,
> shape or form. … The timing of the discovery of these
> listening devices seems incredibly strange, seeing that we
> are four weeks out of the election, and we have a
> Democratic mayor ahead in the polls, and we are on the
> eve of the first mayoral debate.

[**Exhibit "6"** – foxnews.com (from AP) (pub. Oct. 8, 2003)].

37. Thus, in response to the events of October 7, 2003, and the immediate aftermath, which at first threw the campaign into confusion and created a media firestorm threatening to derail Mayor Street's reelection, the record demonstrates that as part of his consulting services, Keel conceived, developed, and served as the focal point for the media strategy that quickly reversed Katz's momentum in the polls.

38. In short, Keel conceived and implemented this strategy on his own, and most certainly without Axelrod's input or involvement.

### *Axelrod misappropriates Keel's consulting services as his own*

39. On February 12, 2015, defendant Penguin published Axelrod's memoir *Believer – My Forty Years in Politics* to wide critical acclaim and enormous sales. Pulitzer Prize-winning historian and author Doris Kearns Goodwin praised *Believer* as "one of the finest political memoirs I have ever read. Through one memorable anecdote after another, Axelrod tells a revealing and moving story of his long and honorable career in public life. This is a thoroughly terrific book."

40. *Believer* quickly rose as high as #3 on the *New York Times'* Best-Seller list and is currently the #1 best-seller in *Amazon's* national politics category.

41. Axelrod has and continues to vigorously promote and market *Believer* through book-signing events and dozens of interviews with national and local media. Although he describes *Believer* as a "political memoir," Axelrod plainly also intended the book to provide advertising for promoting his political consulting business which Axelrod, upon information and belief, continues to actively pursue.

42. In *Believer's* description of events, Axelrod misappropriates the public relation services Keel provided as if his own.

43. According to Axelrod, he received a call from George Burrell, who was a senior advisor to Mayor Street. (Although Axelrod doesn't assign a date to this call in *Believer*, it is clear from the context that Axelrod maintains the call occurred before any media knew of the discovery of the bug.)

44. As recounted in *Believer*, Axelrod states Burrell told him: "I think we have a problem." 'Problem?' [Axelrod] asked warily." Burrell purportedly responds: "Yes, it seems we've found a bug in the Mayor's office." [**Exhibit "7"** at pp. 141-42].

45. Burrell has stated that he does not remember those specific exchanges with Axelrod, nor exactly on which date they may have occurred, and no one from Axelrod's Offices or Penguin ever called Burrell to fact-check the accuracy of those direct quotes.

46. According to Axelrod's account, after learning from Burrell that the U.S. Attorney's Office had acknowledged responsibility, he immediately conceived a way to use the bug to the Mayor's advantage:

> Four weeks before the election, ***the news would be filled with headlines about a federal investigation of the mayor***

*and his administration. It struck me, as I thought about it,* that this was our problem but also our opportunity. In an overwhelmingly Democratic town, a probe launched by the Republican Justice Department in Washington would surely be greeted with skepticism, perhaps even outrage. *I called Burrell back. 'We need to hold a press conference on the steps of City Hall and accuse John Ashcroft of trying to steal this election.'* Attorney General Ashcroft, a well-known conservative ideologue, was highly unpopular among Democrats. When Street confronted reporters, frantic over the news, he came armed with a line I had written for him: 'I'm happy to speak into a microphone I can see.'

[**Exhibit "7"** at p. 142 (emphasis added)].

47. In stating "… the news would be filled with headlines about a federal investigation …," Axelrod is describing the time immediately after the bug was discovered but before any newspaper stories were published about it, *i.e.*, October 7, 2003.

48. Any reasonable reader of *Believer* would believe it was Axelrod who met with the media and rendered the "Republicans Did It" crises management services, and not Keel.

49. Yet, as late as two days after the bug was first discovered, Axelrod was quoted on October 9th in the *Philadelphia Inquirer* as stating:

> The worst thing we can do in a situation like this is make rash decisions based on the politics of the moment. … There's a lot we don't know about this. We're going to keep running our program and will make adjustments if we have to or need to.

[**Exhibit "8"** – *Philadelphia Inquirer* (pub. Oct. 9, 2003)].

50. In that same Article, Keel was quoted as saying:

> Do we believe that the Republican Party, both at the
> federal level and state level, is pulling out every stop to
> get Pennsylvania in 2004?  Absolutely.  Is the Republican
> Party capable of dirty tricks?  I think that is well
> documented.

*Id.*

51. Yet, in *Believer*, Axelrod says he rendered the services which were

actually rendered by Keel, and makes no reference whatsoever to the contradictory

quotes above.

52. Campaign Manager Fordham recalls that Axelrod was in Chicago on

October 7, 2003, and could not be reached throughout the day. On first hearing of

Keel's services in developing and implementing the "Republicans Did It" approach

to the media, Axelrod called Fordham demanding Keel immediately "cease and

desist" such media crisis management services.

53. CNN commentator and *Philadelphia Inquirer* columnist Michael

Smerconish recently interviewed Axelrod and wrote a piece that liberally quoted

Axelrod's self-aggrandizing account of his purported central role in implementing

the damage-control services for the Campaign. [**Exhibit "9"** – *Philadelphia Inquirer*

(pub. Feb. 22, 2015)].

54. Under the lead banner "The Pulse:  No regrets on Street Tactic,"

Smerconish asked Axelrod whether, "in light of the many convictions that resulted

from the probe, [he] had any regrets about his role in blaming the GOP?"

55. According to Smerconish's article, Axelrod responded with an emphatic

"No":

> I don't, Michael, because, as you know, John Street was
> never indicted for anything. He was never accused of
> anything and I felt that to have bugged his office
> particularly in the midst of a very competitive partisan
> race was not the right thing to do and would not have
> happened without the knowledge of the Justice
> Department at the highest levels ....

**[Exhibit "9"].**

56. In a recent interview with David Davies, a prominent journalist

throughout the Commonwealth of Pennsylvania, that took place within weeks of

*Believer's* publication, and which was broadcast throughout the Commonwealth and

elsewhere, Axelrod describes receiving a call from an aide to Mayor Street

(presumably Burrell) advising that a bug had been discovered in Mayor Street's

Office that apparently belonged to the United States' government. Axelrod claims

that after contemplating the development for "about an hour," he called back to

advise that the campaign "should go out there and denounce them, and say that

John Ashcroft is not going to steal this election."[1]

57. Thus, through false descriptions, Axelrod has widely credited and

continues to credit himself with providing on October 7, 2003, the crisis

management services Keel solely provided on the 7th and 8th of October 2003.

### Axelrod Misappropriated and Falsely Designated the Origin of Keel's Consulting and Crisis Management Services to Mayor Street's Campaign

58. Contrary to Axelrod's false designations of origin, it was Frank Keel's

consulting and crisis management services – not Axelrod's services – that swung

---

[1] Audio file available at http://www.newsworks.org/index.php/local/politics/78834-obama-advisor-recounts-time-with-former-philly-mayor-john-street.

momentum back to Mayor Street and led to his decisive victory in the November election.

59. It was Keel who stood in front of the media the very next morning and, for the first time, offered up the "Republicans Did It" explanation for the bug; it was Keel who had to convince an always (and appropriately) skeptical media throng of the *bona fides* of his explanation; it was Keel who risked being "thrown under the bus" by the Street Campaign if the explanation backfired; and it was Keel who risked public and professional scorn if he was "thrown under the bus."

60. Axelrod did not meet or interface with any media regarding the implementation of the "Republicans Did It" crisis management services until well after Keel first did so.

61. Indeed, a decade after the bug was found, *Philadelphia Daily News* Reporter Chris Brennan described Keel as having "a front-row seat on Mayor Street's Campaign team" and duly credited Keel as the "father of the Bush-did-it defense, which suggested the President wanted a Republican to win Philadelphia's mayoral office to help him win Pennsylvania in the 2004 presidential race." [**Exhibit "10"** – *Philadelphia Daily News*, "Bugging Bombshell: 10 Years Later" (pub. Oct. 4, 2013)].

62. According to Fordham, "Frank Keel, more than any other, shared the belief that it was a political play. We were getting slammed across the country. The 'Say Nothing' strategy was killing us. Frank Keel was the most visibly upset." Fordham further confirmed the critical impact of Keel's services:

> In fact, when David Axelrod finally came to town and got
> on board with the strategy, as Frank entered the room for
> a strategy planning session as we began to regroup,
> **_Axelrod said, 'There's our hero!' ..._** Without question, the
> one that changed the tide and initiated our response from
> the listening [bug] incident was Frank Keel.

[**Exhibit "5"** – Shawn Fordham Statement].

63.  In contrast to cases such as *Dastar Corp v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and its progeny, which generally reject "false designation of origin" claims under the Lanham Act that allege the misappropriation of "any idea, concept, or communication embodied" in a particular good or service, Axelrod's false designation here is not of "any idea, concept, or communication." To the contrary, through *Believer* and other media outlets, Axelrod falsely identifies (or designates) himself as the provider and manufacturer of the *services* that Keel provided to and manufactured for Mayor Street's reelection campaign. Accordingly, *Dastar* and cases standing for similar limitations on Lanham Act claims do not apply to Plaintiffs' claims here.

### *Axelrod Continues to Compete with Keel and Keel Communications for Clients Seeking Consulting and Crisis Management Services*

64.  While ostensibly heading the University of Chicago's "Institute of Politics," it is believed and therefore alleged that Axelrod continues to provide his competitive services to local, national, and even international clients.

65.  For example, Great Britain's *Daily Mail* recently reported that the Labour Party had retained Axelrod in a general election described as the "'most negative, nasty and personal' in UK history – thanks in part to the importation by

Conservatives and Labour of spin doctors from the US." [**Exhibit "11"** – "The Life of Nigel: He's No Messiah" (pub. Mar. 6, 2015)].

66. Aside from this recent foray into international political consulting, for decades Axelrod has provided services to "clients at every level of politics – from candidates for U.S. President to Governors, State Supreme Court Justices, Senators, Congressmen and Mayors. We've helped win races across the country – from New England to California and everywhere in between." [**Exhibit "12"** – AKPD website].

67. Axelrod's high-profile clients from Pennsylvania include Mayor Street and former Supreme Court Justice Seamus McCaffery. *Id.*

68. Competing with Axelrod for the same business, Keel's high-profile clients in Pennsylvania have included the Philadelphia Court of Common Pleas, the International Brotherhood of Electrical Workers, Local 98, the Philadelphia's Firefighters' Union, the Union representing Philadelphia Gas Works' employees, and Pennsylvania Attorney General Kathleen Kane.

69. Accordingly, Keel and Keel Communications have competed directly with Axelrod over the past 15 years in marketing their consulting and crisis management services to the same class of prospective clients.

***Despite Easy-to-Spot warnings of Axelrod's Fabrications, Penguin
Failed to Fact-Check or Confirm any of Believer's purported Statements of Fact***

70. On information and belief, Penguin failed to fact-check or confirm any of Axelrod's representations or descriptions of the purported facts recounted in *Believer*.

71. Even before *Believer's* official publication date, participants with first-hand knowledge of the facts publically identified fabrications in Axelrod's *Believer* accounts.

72. Most prominently, Axelrod accused President Obama in *Believer* of lying about his actual, long-term support for gay marriage, claiming that Obama deceived the American people into believing that he opposed gay marriage solely as a matter of political expediency and to avoid alienating religious conservations, in particular African-American church leaders and their congregations. [**Exhibit "7"** – *Believer* at pp. 446-47].

73. President Obama himself was compelled to set the record straight. Obama described his changing views on gay marriage as an evolutionary process which ultimately led him to conclude that civil unions (which he previously advocated) were an inadequate alternative to legally-recognized gay marriage:

> 'I think David is mixing up my personal feelings with my position on the issue,' Obama said in an interview with BuzzFeed News. 'I always felt that same-sex couples should be able to enjoy the same rights, legally, as anybody else, and so it was frustrating to me not to, I think, be able to square that with what were a whole bunch of religious sensitivities out there.'

[**Exhibit "13"** – CNN Report captioned "Obama: Axelrod 'mixing up' gay marriage stance" (pub. Feb. 11, 2015)].

74.  Having presumably at least read *Believer* before its publication, Penguin's editors nonetheless failed to take even the most rudimentary steps to verify Axelrod's extraordinary accusation that President Obama was lying to the American people about his position on a policy issue of great national importance.

75.  Axelrod similarly appears to have fabricated his purportedly factual description of President Obama's telephone call with Mitt Romney following the president's 2012 election victory. In seemingly fine detail, Axelrod recounts in *Believer* the conversation from a supposedly ringside seat:

> Shortly before midnight in Chicago, Romney called. We gathered around Obama as they spoke. Obama said the appropriate things, congratulating his opponent on a hard-fought race and wishing Romney's family well. He was unsmiling during the call, and slightly irritated when it was over. 'He said, "We were surprised. You really did a great job on getting the vote in places like Cleveland and Milwaukee." In other words, black people,' the president said. 'That's what he thinks this is all about.'

[**Exhibit "7"** – *Believer* at p. 477].

76.  According to Romney aide Garrett Jackson, the conversation described by Axelrod never took place. Jackson told CBS News "that it's 'ridiculous' and a 'lie' to say Romney spoke at all about [get out the vote] efforts in black areas. Jackson further confirmed that at no point during his conversation with President Obama "did Romney get specific about certain parts of the country." [**Exhibit "14"**].

77. Axelrod's remarkable accusations against both President Obama and Mitt Romney should have given any publisher good reason to seek independent confirmation of Axelrod's factual representations and descriptions as published in *Believer*.

78. Similarly, even the most cursory review of media reports on the bug's discovery and the Street campaign's response would have quickly revealed gaping inconsistencies and misrepresentations in Axelrod's account with regard to the services rendered by Keel.

79. In light of the above red flags which were either known by Penguin or readily ascertainable by Penguin from public records before publication of *Believer*, it was reasonable for Penguin to anticipate that other aspects of Axelrod's book, including the representations concerning his role in Mayor Street's 2003 campaign, were likewise fabricated.

80. In failing to conduct an investigation or engage in even minimal fact-checking, Penguin affirmatively enabled Axelrod's deceptions on the American public and is thus equally accountable under a contributory liability theory for Axelrod's "reverse passing off" of Keel's services to Mayor Street's campaign as his own services.

*Through Believer's false designation of the origin of Keel's services to Mayor Street's campaign, and through false and misleading descriptions and representations of fact, Defendants caused Keel and Keel Communications to suffer financial and other damages compensable under the Lanham Act*

81. As a direct and proximate result of Defendants' Lanham Act violations, Keel and Keel Communications have suffered financial harm, including lost business, lost business opportunities, and lost profits.

82. In addition, the successful and highly-publicized services Keel and Keel Communications provided to Mayor Street's campaign greatly enhanced Keel's and Keel Communications' reputation in the field and played a large role in Keel's and Keel Communications' future successes in securing and retaining high-profile clients.

83. In misappropriating credit for and the origin of Keel's services and Keel's preeminent role in defining and implementing the campaign's response to the bug's discovery, Axelrod has caused and continues to cause debilitating harm to a professional reputation that Keel and Keel Communications devoted his and its entire career to developing.

84. Axelrod has taken false credit for a defining episode in Keel's professional career, which has caused Keel emotional distress and professional embarrassment and has damaged his reputation among colleagues and current and prospective clients.

85. In attempting to mitigate the economic and reputational harm caused by Axelrod's false designations of origin, false representations of fact, and false descriptions of fact, Keel and Keel Communications will necessarily have to incur

significant additional financial damages in the form of corrective advertising expenses required to correct the record, restore Keel's reputation, to accurately identify the origin of the services rendered to the Street Campaign, and to otherwise restore the competitiveness of Keel's services before the publication of *Believer*.

## COUNT I
### (Lanham Act Violation – 15 U.S.C. § 1125(a))

86. Plaintiffs incorporate by reference each of the preceding Paragraphs of this Complaint.

87. In connection with services used in interstate commerce, defendants Axelrod and Penguin falsely designated Axelrod as the provider of services that Plaintiffs Keel and Keel Communications actually provided to Philadelphia Mayor John Street's 2003 reelection campaign.

88. As an integral part of that false designation of origin, Defendants Axelrod and Penguin made false and misleading representations and descriptions of fact.

89. Defendants' false designations of origin and their false and misleading representations and descriptions of fact are likely to cause consumer confusion, mistake, or deception as to the origin of services, resulting in Plaintiffs' loss of consulting service business and causing Plaintiffs financial harm.

90. Defendants' actions violate § 1125(a) of the Lanham Act and have and will cause economic harm to Plaintiffs' in amounts not yet calculated.

91. Defendant Penguin is directly liable under a contributory liability theory as a publisher of the deceptive representations of co-Defendant Axelrod in

that Penguin supplied materials and rendered its editorial and publication services to Axelrod, and Penguin, having actual knowledge and/or reason to know that Axelrod's *Believer* contained fabrications, including the fabrication related to Axelrod's purported services to the Street campaign in 2003, thereby directly and substantially assisting Axelrod in making the deceptive representations.

92. Defendant Penguin's contributory liability subjects them to monetary damages in that Penguin knew, had reason to know or recklessly disregarded the fact that it was assisting Axelrod in making the deceptive representations causing the mistaken belief that Axelrod was actually the supplier of political consulting services which were actually supplied by Plaintiffs.

93. Defendant Penguin is also vicariously liable for co-Defendant Axelrod's wrongful conduct in that, on information and belief, Defendant Penguin exerted control over all aspects of Axelrod's conduct in drafting, revising, and editing *Believer* such that Defendant Penguin was a principal and Axelrod was Penguin's authorized agent and/or employee.

**WHEREFORE**, Plaintiffs Frank Keel and Keel Communications, LLC request that the Court enter judgment in their favor and against Defendants, jointly and severally, award Plaintiffs damages in excess of the $150,000 arbitration threshold, including Plaintiffs' lost profits, Defendants' profits, three times Plaintiffs' actual damages, Plaintiffs' costs for corrective advertising, Plaintiffs' attorneys' fees and costs incurred in bringing and maintaining this action, and such other relief that the Court finds just and equitable.

## COUNT II
### (Common Law Unfair Competition)

94.  Plaintiffs incorporate by reference each of the preceding Paragraphs of this Complaint.

95.  In connection with the marketing of his public relations and political consulting services through the book *Believer* and other media as set forth herein, Defendant made representations likely to deceive or mislead prospective customers by causing the mistaken belief that Defendant Axelrod was actually the supplier of political and crisis management consulting services which were actually supplied by Plaintiffs.

96.  Defendants' misrepresentations in this regard were to the likely commercial detriment of Plaintiffs in that the representations were material and Plaintiffs have a reasonable basis for believing that the deceptive representations caused or are likely to cause a diversion of trade from Plaintiffs and/or harm Plaintiffs' reputation or good will in the public relations and political consulting fields.

97.  Defendant Penguin is directly liable under a contributory liability theory as a publisher of the deceptive representations of co-Defendant Axelrod in that Penguin supplied materials and rendered its editorial and publication services to Axelrod, and Penguin, having actual knowledge and/or reason to know that Axelrod's *Believer* contained fabrications, including the fabrication related to his services to the Street campaign in 2003, thereby directly and substantially assisting Axelrod in making the deceptive representations.

98.   Defendant Penguin's contributory liability subjects them to monetary damages in that Penguin knew, had reason to know or recklessly disregarded the fact that it was assisting Axelrod in making the deceptive representations causing the mistaken belief that Axelrod was actually the supplier of political consulting services which were actually supplied by Plaintiffs.

99.   Defendant Penguin is also vicariously liable for co-Defendant Axelrod's wrongful conduct in that, on information and belief, Defendant Penguin exerted control over all aspects of Axelrod's conduct in drafting, revising, and editing *Believer* such that Defendant Penguin was a principal and Axelrod was Penguin's authorized agent and/or employee.

100.   Defendants' unfair competition has directly and proximately resulted in Plaintiffs' loss of consulting service business, caused Plaintiffs financial harm, reputational harm, emotional harm, and resulted in the need for Plaintiffs to incur corrective advertisement expenses.

**WHEREFORE,** Plaintiffs request that the Court enter judgment in their favor and against Defendants, jointly and severally, award Plaintiffs damages in excess of the $150,000 arbitration threshold, including Plaintiffs' lost profits, Defendants' profits, punitive damages, Plaintiffs' costs for corrective advertising, their attorneys' fees and costs incurred in bringing and maintaining this action, and such other relief that the Court finds just and equitable.

/s/ George Bochetto
George Bochetto (Pa. 27783)
David P. Heim (Pa. 84323)
Thomas E. Groshens (Pa. 51118)
**BOCHETTO & LENTZ**
1524 Locust Street
Philadelphia, PA 19102
(215) 735-9000
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com
tgroshens@bochettoandlentz.com

*Counsel for Plaintiffs, Frank Keel
and Keel Communications, LLC*

**Dated:** March 24, 2015