**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRANK KEEL et al.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **NO.  15-1507** |
| | : | |
| **DAVID AXELROD, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                          **December 1, 2015**

<u>**MEMORANDUM OPINION**</u>

This case centers around a short passage in a book authored by David Axelrod, titled *Believer: My Forty Years in Politics*.  Plaintiff Frank Keel ("Keel"), a Pennsylvania based political and media consultant, initiated this lawsuit against Defendants Axelrod and Penguin Random House, LLC ("Penguin") pursuant to 15 U.S.C. § 1125(a) of the Lanham Act and Pennsylvania's law on unfair competition.[1]  The passage in question describes a political strategy devised and implemented during the 2003 reelection campaign of former Philadelphia Mayor John F. Street.  Keel alleges that Axelrod falsely took credit for the political consulting services described in that passage, which Keel asserts he developed himself, without any input from Axelrod.  Keel explains that Axelrod has caused potential clients to believe that the political consulting services described in *Believer* were devised by Axelrod and that this misrepresentation caused and will continue to cause Keel to lose business.  Keel also claims that

---

[1] Keel Communications, LLC, also a plaintiff in this suit, has brought the same claims against the same defendants as Keel.  Because the claims and allegations made by Keel and the firm which bears his name are the same, I only refer to Keel in this opinion.

Penguin, as the publisher of *Believer*, is vicariously and/or contributorily liable for Axelrod's false representation in the passage.

Before me is Defendants' motion to dismiss Keel's complaint.  Because Keel has not pled a plausible claim under the Lanham Act or the accompanying state law claim, I will grant Defendants' motion.

## I.    FACTUAL BACKGROUND

When deciding a motion to dismiss for failure to state a claim brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Viewed in that light, the complaint centers around two political consultants—Philadelphia-area public relations consultant Frank Keel, and David Axelrod, a "campaign and media strategist for Democratic candidates seeking public office at the national, state, and local levels."  Keel credits his success as a political consultant to the services he provided as a "spokesman, media advisor, and crisis manager" for numerous Democratic hopefuls across Pennsylvania since the early 1990s.[2]  Keel claims that perhaps the most pivotal moment in his consulting career was the 2003 reelection campaign of former Philadelphia Mayor Street, which included both Keel and Axelrod as consultants tasked to keep Street in office.  The complaint describes Keel's successful,

---

[2] The complaint also describes Keel as "ballsy."  (Compl. ¶ 18.)  The purpose of a complaint is "to inform the opposing party and the court of the nature of the claims and defenses being asserted by the pleader and, in the case of an affirmative pleading, the relief being demanded."  Bunting v. Bristol-Myers Squibb Co., 2011 WL 2784101, at *1 (D.N.J. July 12, 2011) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1182 3d ed. 2004).  Perhaps terms such as "tenacious" or "gutsy" would have been more appropriate and dignified characterizations to include in a publicly filed pleading than "ballsy."  This word choice raises some concern as to whether Keel and his counsel view their pleading more as an advertisement opportunity rather than a method to properly inform Axelrod of the nature of his claims.

strategic management of the beleaguered Street campaign as Keel's "watershed career moment." (Compl. ¶¶ 7, 14, 17–19.)

The complaint goes on to allege the following facts regarding the Street campaign:  The incumbent Street was in a close race with Republican challenger Sam Katz in the weeks leading up to the election.  On October 7, 2003, members of the Philadelphia Police Department discovered an FBI listening device in Mayor Street's City Hall office, reportedly placed there as part of a "federal investigation into City Hall corruption."  The discovery of the listening device prompted concerns from the media, who wanted to know why Street was the target of an FBI investigation.  On the evening of October 7, 2003, Street held an impromptu press conference, where he assured the public he had "done nothing wrong."  (Id. ¶¶ 17, 20–24; see also Ex. 3.)

Keel alleges that in the hours after this press conference, he proposed, "[a]s part of the consulting services he was providing to Mayor [Street]," that the campaign "publicly announce that the bug was part of a 'Republican dirty-tricks' strategy."  Keel claims that he suggested that Street's campaign should publicly represent that the listening device scheme originated high in the George W. Bush administration, and was placed to swing Philadelphia and Pennsylvania for the Republican Party in the upcoming 2004 presidential election.  Keel states that he was authorized by Street's campaign Manager Shawn Fordham ("Fordham") to implement the "Republicans Did It" strategy on the morning of October 8, 2003 at a civic event, where Keel announced that instrumental members of the national Republican Party were the likely origin of the listening device.  According to Keel, Fordham corroborated his role as the "lead" in the campaign's effort to "fight back 'the bug,'" and, during the relevant time, Keel allegedly spoke to reporters to reinforce the new campaign strategy.  Finally, Keel's complaint states that he

"conceived and implemented" the "Republicans Did It" strategy on his own, without any "input

or involvement" from Axelrod.  (Compl. ¶¶ 25–38.)

Based on this background, Keel asserts that a single passage of Axelrod's 488-page book

*Believer* violates the Lanham Act.  The short excerpt at issue states:

> As we approached the final month of the campaign, I got a call from George Burrell, Street's savvy political deputy at City Hall.

> "I think we have a problem."

> "Problem?"  I asked warily.

> "Yes, it seems we've found a bug in the mayor's office."

> "A bug?"

> "Yes, a listening device."

> "And who do we think this bug belongs to?"  I said.  I really didn't have to ask, but was hoping against hope for an unexpected explanation.

> "It appears to belong to the United States government," Burrell said, slamming the door on my wishful thinking.

> Four weeks before the election, the news would be filled with headlines about a federal investigation of the mayor and his administration.  It struck me, as I thought about it, that this was our problem but also our opportunity.  In an overwhelmingly Democratic town, a probe launched by the Republican Justice Department in Washington would surely be greeted with skepticism, perhaps even outrage.  I called Burrell back.  "We need to hold a press conference on the steps of City Hall and accuse John Ashcroft of trying to steal this election."  (Attorney General Ashcroft, a well-known conservative ideologue, was highly unpopular among Democrats.)  When Street confronted reporters, frantic over the news, he came armed with a line I had written for him: "I'm happy to speak into a microphone I can see!"

(Id. ¶¶ 44–46; Ex. 7 at 141–42.)

Keel asserts that readers of the *Believer* excerpt would believe that Axelrod, rather than

Keel, actually advised the Street campaign to implement the "Republicans Did It" strategy.

Keel's complaint goes on to explain that one day after the initial press conference where he

announced that the Republicans were behind the listening device, Axelrod emphasized that "[t]he worst thing we can do in a situation like this is make rash decisions based on the politics of the moment. . . .  There's a lot we don't know about this."   According to Keel, Axelrod demanded that he "immediately" stop implementing the "Republicans Did It" strategy.  In short, Keel claims that the *Believer* excerpt misappropriates Keel's public relations services, by falsely crediting those services to Axelrod.  (Compl. ¶¶ 42, 48–49, 52; Ex. 8.)

In asserting that *Believer* is more than just a political memoir, Keel alleges that Axelrod "plainly also intended the book to provide advertising for promoting his political consulting business which Axelrod, upon information and belief, continues to actively pursue."  In an effort to bolster this statement with facts, Keel points to book signings and interviews that Axelrod has attended to promote his memoir.  Keel's complaint also emphasizes the "wide critical acclaim and enormous sales" of *Believer*.  (Id. ¶¶ 39–41.)

Keel also contends that he and Axelrod continue to directly compete for potential clients. He notes that Axelrod was recently brought in to assist with a general election in the United Kingdom, proving that Axelrod continues to offer his consulting services.  As evidence that he and Axelrod compete for similar clients, Keel juxtaposes two high profile Pennsylvania clients Axelrod has worked for—Mayor Street and former Pennsylvania Supreme Court Justice Seamus McCaffery—against Keel's own list of clients, which includes the Philadelphia Court of Common Pleas and Pennsylvania Attorney General Kathleen Kane.  (Id. ¶¶ 64–69.)

With respect to Penguin's role in the dispute, Keel alleges that the publisher is vicariously liable for Axelrod's misrepresentation because Penguin failed to "fact-check or confirm any of Axelrod's representations or descriptions" prior to publishing *Believer*.  In support of his allegations that Penguin failed to check facts, Keel notes two additional passages

in *Believer* that recount separate interactions with President Obama and former Republican presidential candidate Mitt Romney—both of which were respectively denied by President Obama and one of Mitt Romney's aides before *Believer* was published.  (Id. ¶¶ 16, 45, 70–80.)

Finally, Keel alleges that Axelrod's misappropriation of his political consulting services "has caused and continues to cause debilitating harm to a professional reputation that Keel . . . devoted his . . . entire career to developing."  Keel alleges that he has suffered "emotional distress and professional embarrassment" as a result of Axelrod's misappropriation of the "Republicans Did It" strategy and that he will incur financial damages in paying for "corrective advertising." (Id. ¶¶ 83–85.)

## II.      STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully."  Id.  To determine the sufficiency of a complaint under Twombly and Iqbal, the Court must take the following three steps: (1) the Court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

### III.    LEGAL ANALYSIS

Keel brings a federal claim under § 1125(a) of the Lanham Act, and a state law claim under Pennsylvania's common law prohibition on unfair competition.  Both of these claims hinge on his argument that Axelrod, in *Believer*, falsely took credit for political consulting services that Keel provided to Street's reelection campaign, thus giving Axelrod an unfair reputational advantage over Keel in competing for the same clients.[3]   Keel explains that Axelrod's misappropriation of services is "likely to cause consumer confusion, mistake or deception as to the origin of services, resulting in [Keel's] loss of consulting service business," and "[is] likely to cause a diversion of trade from [Keel] and/or harm [to Keel's] reputation or good will in the public relations and political consulting fields." (Compl. ¶¶ 89, 96.)

### A.  Is a "Commercial Use" Required Under the Lanham Act?

The Lanham Act states, in relevant part, that

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a).  While the Supreme Court has emphasized that the primary purpose of the Lanham Act is to prevent trademark infringement, it has stated that § 1125(a) "is one of the few

---

[3] Given that an "abundant line of cases from this circuit [note that] an unfair competition claim under Pennsylvania common law is the equivalent of a federal Lanham Act claim," I need not deal with these claims separately.  See, e.g., Checker Cab Philadelphia, Inc. v. Uber Technologies, Inc., 2015 WL 966284, at *3 n.3 (E.D. Pa. Mar. 3, 2015) (Quiñones Alejandro, J.) (citing Flynn v. Health Advocate, Inc., 169 F. App'x 99, 100 n.3 (3d Cir. 2006); Ecore International, Inc. v. Downey, 2015 WL 127316, at *6 (E.D. Pa. Jan. 7, 2015) (Schmehl, J.)). "[F]ederal case law treatment of Lanham Act claims provides, at the very least, persuasive authority when dealing with a plaintiff's common law unfair competition claims."  Id.

provisions that goes beyond trademark protection" to regulate certain false representations regarding the origin of goods and services provided.  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 28–29 (2003).  To illustrate, § 1225(a) prohibits the Coca-Cola Company from selling its product under the name Pepsi-Cola (a "passing off" claim), or claiming that Pepsi-Cola is a Coca-Cola product (a "reverse passing off" claim).  See Dastar, 539 U.S. at 32.  Here, Keel alleges a "reverse passing off" of services claim under the Lanham Act, alleging that Axelrod falsely claimed Keel's political consulting services as his own.

In recognizing limited "passing off" and "reverse passing off" claims, the Supreme Court has emphasized a narrow interpretation of the Lanham Act to prevent conflicts with other federal laws that protect proprietary information, such as copyright and patent law.  See Dastar, 539 U.S. at 33–34; see also TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29–30 (2001) (recognizing limited protections for product designs under the Lanham Act).  Dastar identified the practical difficulties that result in requiring identification of all uncopyrighted sources that are used to create a final product, concluding that "[w]e do not think the Lanham Act requires this search for the source of the Nile and all its tributaries."[4] Dastar, 539 U.S. at 35–36.

Given these limitations, the majority of circuits have required a threshold commercial element for Lanham Act claims necessitating that a plaintiff plead that the goods or services were misappropriated in the course of a defendant's commercial communication or activity.  See, e.g., Farah v. Esquire Magazine, 736 F.3d 528, 541 (D.C. Cir. 2013) (citing a collection of cases

---

[4] The Supreme Court presented the following hypothetical to demonstrate the difficulty that might result from allowing Lanham Act claims regarding the origin of expressions contained in communicative products: "A video of the MGM film Carmen Jones, after its copyright has expired, would presumably require attribution not just to MGM, but to Oscar Hammerstein II (who wrote the musical on which the film was based), to Georges Bizet (who wrote the opera on which the musical was based), and to Prosper Merimee (who wrote the novel on which the opera was based)."  Dastar, 539 U.S. at 35.

from various circuit courts to find that "[e]very circuit court of appeals to address the scope of [the Lanham Act] provisions have held that they apply only to commercial speech.").

However, somewhat at odds with the above precedent requiring a "commercial use" threshold is a line of cases from the United States Court of Appeals for the Second Circuit, which emphasize that the "use in commerce" language of the Lanham Act suggests that the Act has a broader application.  See United We Stand America, Inc. v. United We Stand, America New York, Inc., 128 F.3d 86, 92–93 (2d Cir. 1997) (finding that the "use in commerce" requirement of § 1127 was not intended to limit the Lanham Act to "profitmaking activity.").  The United court reasoned that "expressive" and "commercial" uses are not mutually exclusive categories, but that "most editorial, artistic, and humorous works are sold in commerce," and thus the provisions of the Lanham Act could be applied to such works.  Id. at 91–92.  Most recently, the Second Circuit explained that the "use in commerce" requirement is met when a trademark "has been displayed to consumers in connection with a commercial transaction."  Kelly-Brown v. Winfrey, 717 F.3d 295, 306 (2d Cir. 2013).

With this precedent in mind, Keel argues that the Second Circuit's broader "use in commerce" requirement has allowed Lanham Act claims to proceed under similar factual circumstances as this dispute.  I disagree.  The cases Keel relies upon to support the broader "use in commerce" threshold for Lanham Act claims all involve trademark name infringement or the direct solicitation of clients, neither of which have been pleaded here.  For example, in Kelly-Brown, the "use in commerce" approach was applied to the defendant's unauthorized use of a federally trademarked company slogan that the defendant prominently displayed on the front cover of its magazine and in various online promotions—circumstances that present a much greater risk of deceiving potential customers as to the proper origin of the slogan than the facts

9

presented in this case.   See Kelly-Brown, 717 F.3d 295, 298–303; see also MGM-Pathe Commc'ns Co. v. Pink Panther Patrol, 774 F. Supp. 869 (S.D.N.Y. 1991) (involving defendant's unauthorized use of plaintiff's trademark "Pink Panther" in the title of the defendant's gay rights organization).   These facts are entirely different than Axelrod allegedly taking credit for the political strategy described in a brief passage of his book.

It is true that the broader "use in commerce" requirement endorsed by the Second Circuit has permitted some claims under the Lanham Act to proceed when a defendant makes false representations in direct solicitations to potential customers.   See National Artists Management Co. v. Weaving, 769 F. Supp. 1224, 1234–36 (S.D.N.Y. 1991) (finding that defendant's false representations regarding her former employer's commercial and booking practices and defendant's direct solicitation of her former employer's customers was sufficient to sustain the plaintiff's Lanham Act claim).   In National Artists, the defendant was a former employee of plaintiff's booking agency for theatrical productions.   Id. at 1226.   The defendant quit her position at plaintiff's booking agency, before the expiration of her contract, to form a competing booking agency.   Id. at 1229.   In promoting her rival business, the defendant allegedly contacted specific clients of the plaintiff, notifying those clients that she was forced to leave her former employment due to improprieties at the plaintiff's agency.   Id. at 1230–31.

But here, in contrast to the facts of National Artists, a single passage in a nationally marketed book cannot be viewed as a direct solicitation of services to specific clients.   Moreover, the *Believer* passage does not refer to any services that Keel trademarked.   Thus, even if I adopted the Second Circuit's broader "use in commerce" approach for stating a claim under the Lanham Act, the absence of direct client solicitation and trademark infringement undercuts Keel's "reverse passing off" of services claim.

In this Circuit, The United States Court of Appeals for the Third Circuit has not explicitly stated that a "commercial use" requirement must be met to sustain a "reverse passing off" claim under the Lanham Act.  It has, however, recognized that an alleged misleading use must have a clear, promotional purpose to attract customers.  See Facenda v. NFL Films, Inc., 542 F.3d 1007, 1017–18 (3d Cir. 2008) (finding that defendant's unauthorized use of plaintiff's voice in a televised program that primarily promoted the upcoming release of a video game was actionable under the Lanham Act as commercial speech).  While the Third Circuit has allowed claims under the Lanham Act when the offending speech is commercial in nature, it has expressed reservations in authorizing actions against non-commercial speech, which is generally protected by the First Amendment.  Facenda, 542 F.3d at 1018; see also U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 932–33 (recognizing reduced First Amendment protections for commercial speech in a defamation dispute involving competing advertisements).

In this district, several courts have recently found that "[t]he Lanham Act regulates only commercial speech."  Valley Forge Military Acad. v. Valley Forge Old Guard, Inc., 24 F. Supp. 3d 451, 455 (E.D. Pa. 2014) (Surrick, J.) (citing Taubman Co. v. Webfeats, 319 F.3d 770, 775 (6th Cir. 2003)); J.G. Wentworth, S.S.C. Ltd. Partnership v. Settlement Funding, LLC., 2007 WL 30115, at *4–5 (E.D. Pa. Jan. 4, 2007) (O'Neill, J.) (finding that because defendant's use of a trademark on a website "triggered commercial advertising" and was tied to the promotion of defendant's business, it satisfied the Lanham Act's "use" requirement).  Other district courts in the Third Circuit have also found that claims under the Lanham Act must concern commercial speech.  See Cellco Partnership v. Communication Workers of America, 2003 WL 25888375, at *4–5 (D.N.J. Dec. 11, 2003) (recognizing that the Lanham Act "use in commerce" requirement is satisfied when a defendant advertises or promotes its services); Bd. of Directors of Sapphire

Bay Condominiums West v. Simpson, 2014 WL 4067175, at *3 (D. Virgin Islands Aug. 13, 2014).

In summary, the majority of circuits require a Lanham act claimant to plead a commercial use. Though the Second Circuit has recognized a broader "use in commerce" requirement for Lanham Act claims, it has limited those claims to quasi-commercial activities such as trademark infringement or the direct solicitation of clients. Keel's claims do not fall under either category. The Third Circuit in Facenda held that Lanham Act "reverse passing off" claims—the type of claim Keel has filed—must allege a clear, promotional purpose to attract potential customers. Consequently, I conclude that to survive Defendants' motion, Plaintiffs' complaint must plausibly plead a commercial use to sustain a Lanham Act cause of action.

Keel disagrees with this conclusion and presses that the Lanham Act extends beyond commercial and regulates political and academic speech. He cites to Wojnarowicz v. American Family Ass'n, 745 F. Supp. 130 (S.D.N.Y. 1990), which generally states that the Lanham Act was enacted to protect "consumers and competitors from a myriad of misrepresentations of products and services in commerce." Id. at 141; see also Pl.'s Resp. at 18. However, the facts and the ultimate disposition of Wojnarowicz do not support Keel's position.

In Wojnarowicz, the defendant, without permission, reproduced the plaintiff's copyrighted artwork in a pamphlet that was mailed to persuade members of Congress to cease public funding for art that did not share the defendant's Judeo-Christian values. Id. at 133–34. The court reasoned that "[b]ecause the pamphlet was not employed in the 'advertising or promotion' of goods or services, plaintiff has failed to satisfy a prerequisite to invocation of the Lanham Act." Id. at 142. Given that plaintiff's Lanham Act claim was dismissed, it is difficult to understand how Wojnarowicz assists Keel.

Keel also cites cases that have found Lanham Act disputes between nonprofits to be actionable. However, the "commercial use" requirement does not depend on the legal status of a defendant's business entity. Rather, this requirement focuses on a defendant's promotional use of the plaintiff's proprietary material. See Valley Forge, 24 F. Supp. 3d at 454–55; see also Birthright v. Birthright, Inc. 827 F. Supp. 1114, 1131, 1133–34 (D.N.J. 1993). Although Keel cites these cases for the proposition that the Lanham Act may be applied beyond classic commercial speech, they still involve trademark infringement or the direct solicitation of customers—both of which are clear, promotional and advertising activities.[5]

### B. Is the Book Passage in Question Commercial Speech?

Commercial speech is generally defined as "expression related to the economic interests of the speaker and its audience, generally in the form of a commercial advertisement for the sale of goods and services." U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914,

---

[5] Keel argues that although Valley Forge states that the Lanham Act only applies to commercial speech, the facts of that case demonstrate the broad scope of commercial speech under the act. (Pl.'s Resp. at 22.) While Valley Forge addressed a dispute between two nonprofit organizations, the conduct at issue was considered commercial because defendants used plaintiff's trademark and logo in an email promotion that "explicitly solicited funds for [d]efendants' alumni services." Valley Forge, 24 F. Supp. 3d at 454–55. Similarly, a United States District Court for the District of New Jersey case allowed a Lanham Act claim to advance in a dispute between nonprofits. See generally Birthright, 827 F. Supp. 1114 (D.N.J. 1993). That case is also distinguished because the "use" at issue in Birthright involved the defendant's continued display of a trademark and logo after its authorization to use such was revoked in violation of 15 U.S.C. § 1114(1), a trademark protection provision of the Lanham Act. See Birthright, 827 F. Supp. at 1131, 133–34. Outside the Third Circuit, Keel points to American Needle & Novelty, Inc. v. Drew Pearson, a United States District Court for the Northern District of Illinois decision that, in dicta, posits that the distribution of marketing materials at a tradeshow might be considered actionable "advertising and promotion" under the Lanham Act, but that position was derived from the American Needle court's finding that the commercial use requirement of the Lanham Act "refers to the business purpose for which the advertising or promotion is used." See American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc., 820 F. Supp. 1072, 1077–78. Thus, American Needle still stands for the rule that a Lanham Act claimant must allege that the defendant misappropriated the claimant's goods or services for the commercial purpose of promoting or advertising defendant's competing business.

933 (3d Cir. 1990) (citing <u>Bolger v. Youngs Drug Prods. Corp.</u>, 463 U.S. 60, 66–67 (1983)). Particularly relevant to the facts of this case, speech does not lose its broad First Amendment protection "even though it is carried in a form that is 'sold' for profit." <u>See</u> <u>Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.</u>, 425 U.S. 748, 761 (1976) (citing <u>Smith v. California</u>, 361 U.S. 147, 150 (1959) (books); <u>Joseph Burstyn, Inc. v. Wilson</u>, 343 U.S. 495, 501 (1952) (motion pictures); <u>Murdock v. Pennsylvania</u>, 319 U.S. 105, 111 (1943) (religious literature)).

The Third Circuit has considered the following factors to categorize commercial speech: 1) whether the speech is an advertisement; 2) whether the speech refers to a specific product or service; and 3) whether the speaker has an economic motivation for the speech. <u>Bolger</u>, 463 U.S. at 66–67; <u>U.S. Healthcare, Inc.</u>, 898 F.2d at 933; <u>Facenda</u>, 542 F.3d at 1017. "An affirmative answer to all three questions provides 'strong support' for the conclusion that the speech is commercial." <u>Facenda</u>, 542 F.3d at 1017 (quoting <u>Bolger</u>, 463 U.S. at 67). Categorizing commercial speech requires making a "commonsense distinction between speech proposing a commercial transaction . . . and other varieties of speech." <u>Facenda</u>, 542 F.3d at 1017 (3d Cir. 2008) (quoting <u>Bolger</u>, 463 U.S. at 65)). Finally, "[t]he categorization of speech is a question of law that we must resolve through independent review . . . ." <u>Id.</u> at 1016 (citing <u>Connick v. Myers</u>, 461 U.S. 138, 148 n.7, 150 n.10 (1983)).[6]

Applying the <u>Bolger</u> Factors, <u>Facenda</u> found that a televised program, while featuring a number of expressive and informational elements, was primarily designed to promote a video game, and thus was commercial speech that was actionable under the Lanham Act. <u>See</u> <u>Facenda</u>,

---

[6] Keel argues that the question of whether *Believer* constitutes commercial speech is a question of fact, and thus "cannot be resolved on a motion to dismiss." (Pl.'s Resp. at 18.) However, the Third Circuit in <u>Facenda</u> and two references in the Supreme Court's <u>Connick v. Myers</u> opinion reflect that the categorization of speech is a question of law, and that is the approach I take here.

542 F.3d at 1017–18.  In so doing, the Third Circuit concluded that the televised program met the

second Bolger factor, since the program only referred to a specific product—an upcoming video

game.  Id. at 1017.  Facenda also found that the third Bolger factor was satisfied because the

video game developer had a license agreement with the National Football League ("NFL") that

gave the NFL a clear financial stake in the game's success.  Id.  The first Bolger factor—whether

the speech is an advertisement— was decisive for the Facenda court in ruling that the televised

program was commercial speech.  The Third Circuit relied on the various promotional aspects of

the televised program to show it was an advertisement:

> Like an infomercial, the program focuses on one product, explaining both how it
> works and the source of its innovations, all in a positive tone.  While it does not
> advertise the game's price, the program did feature a clock at its ending that
> displayed the number of days until the video game's release for sale.
> Furthermore, the program was only broadcast eight times in a three-day span
> immediately before the release of the video game to retail stores—much like an
> advertisement for an upcoming film.

Id. at 1017.

Unlike Facenda, the *Believer* passage does not note the availability of consulting services

offered by Axelrod or his associated firm, nor does the passage in question describe unique

features of such services.  The *Believer* excerpt also does not reference a Keel service mark or

brand for the purpose of drawing customers to Axelrod's consulting business.  Compare with

Bosley, 403 F.3d at 677, 677–80 (finding that the unauthorized use of a domain name for

defendant's website to criticize plaintiff's hair removal services was not commercial speech, but

a case where a car company's name was used in the domain name of a defendant's business

website to promote and market computer services to potential customers was commercial

speech).

In an attempt to distinguish the above precedent, Keel argues that falsely taking credit for

political consulting services is actionable under the Lanham Act due to the unique nature of the

political consulting industry— where a consultant's reputation and service record is essential to acquire and keep customers. (See Pl's. Resp. at 27.)  In making this argument, Keel analogizes political consulting services to the architectural services at issue in Gensler v. Strabala, 764 F.3d 735 (7th Cir. 2014).[7]  While I agree that political consultants and architects both rely on their service records to acquire customers, Gensler is distinguishable from the facts of this case because of the defendant's commercial use of proprietary material.

In Gensler, the defendant was a former project designer for an international architectural firm, who left his position to start his own firm.  Id. at 736.  To advertise his new architectural firm, the defendant created a business website and a Flickr[8] account where he stated that he designed five complex buildings that, in truth, were designed by a team of Gensler employees and were credited to the firm as a whole, rather than to any individual designer.  Id.  The Gensler court tacitly acknowledged the clear, promotional nature of the defendant's business website in stating that "we do not think that Gensler has pleaded itself out of court just by alleging that [the defendant] tries to attract sophisticated customers for large projects."  Id. at 739.

In contrast, communications made primarily for expressive purposes, like the political and narrative purposes of Believer, enjoy broad First Amendment protection, and therefore, are generally not actionable under federal statutes such as the Lanham Act.  See Farah, 736 F.3d at

---

[7] It is unnecessary to reach the question of whether a "reverse passing off" of services claim is still tenable after the Supreme Court's ruling in Dastar, which recognized a narrow allowance for "passing off" and "reverse passing off" claims involving "goods" under the Lanham Act (but not including claims involving communicative content that makes up a "good," such as the ideas or expressions in a book).  See Dastar, 539 U.S. at 31–33.  I discuss Gensler, however, only to note the obvious, promotional nature of the misleading speech in that case, compared to the Believer excerpt.

[8] Flickr is a photo and video sharing website, where users can upload photos to "make their photos available to the people who matter to them."  See About Flickr, FLICKR, https://www.flickr.com/about (last visited December 1, 2015).

537–41; see also Citizens United v. Federal Election Comm'n, 558 U.S. 310, 372 (2010) (citation omitted) ("The First Amendment underwrites the freedom to experiment and to create in the realm of thought and speech. Citizens must be free to use new forms, and new forums, for the expression of ideas. The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it.")  In Farah, the United States Court of Appeals for the District of Columbia found that a Lanham Act §1125(a) claim could not be sustained for defendant's noncommercial blog post statements that expressed views on President Obama's birth certificate and eligibility to serve as President of the United States.  Id.

Keel argues that Farah is distinguishable, since the plaintiffs in that case only alleged that the parties were competitors "in the marketplace of ideas," a fact that is "not sufficient to invoke the Lanham Act."  Id. at 541; (Pl.'s Resp. at 23.)  Keel also points out that the Farah court acknowledged that "writers write and publishers publish political tracts for commercial purposes, and it is possible that the kinds of commercial methods made illegal by the Lanham Act could be applied to such tracts."  Id.  However, the mere possibility that an author, like Axelrod, would write a book that employs the deceptive "commercial methods" that are barred by §1125(a) of the Lanham Act is not a plausible fact sufficient to survive a motion to dismiss.  See id. (stressing that defendant's speech must be able to be "plausibly viewed as commercial speech . . .").  Therefore, Keel must allege a plausible fact that suggests Axelrod actually wrote Believer to promote his consulting services to potential clients.

### C. Has Keel Alleged Plausible Facts Suggesting That The *Believer* Excerpt Was Written To Promote Axelrod's Consulting Services?

Since "[a]n affirmative answer to all three [Bolger] questions provides 'strong support' for the conclusion that the speech is commercial," Keel's Lanham Act claim would be likely to

withstand Defendants' motion to dismiss were he to allege facts satisfying these three factors. Facenda, 542 F.3d at 1017.  Keel has not done so.

Considering the third Bolger factor, and viewing the facts in the light most favorable to Keel, I accept that Axelrod had an economic motivation to sell as many copies of *Believer* as possible. But without more, writing a book for profit is not sufficient to render the passage in question commercial speech. See Smith, 361 U.S. at 150.  In this regard, the specific disputed passage in *Believer* lacks an obvious economic motivation to further the political consulting services offered by Axelrod or AKPD Message and Media.[9]

Considering the second Bolger factor, it is unclear whether the *Believer* excerpt refers to a specific product or service, since it only describes the general "Republicans Did It" strategy and Axelrod's role in implementing that scheme, and does not identify concrete, defined consulting services Axelrod offered the Street campaign.  Moreover, the *Believer* excerpt makes no affirmative representations that Keel did not perform specific tasks related to the management of Street's campaign after the FBI listening device was discovered. In fact, the excerpt in question fails to mention Keel at all.  (See Compl. ¶¶ 44–46; Ex. 7 at 141–42.)

Most problematic for Keel's Lanham Act claim is the first Bolger factor that the *Believer* excerpt constitutes an advertisement—that is, a message with a clear, promotional purpose. *Believer* contains creative and informational elements like the televised program in Facenda, such as the organization of chapters, Axelrod's unique voice in chronicling his experiences, and descriptions of political campaigns that Axelrod aided.  However, unlike the televised program in Facenda, *Believer* does not note the availability of the political consulting services offered by Axelrod or AKPD Message and Media, nor does it provide any other specific information about

---

[9] AKPD Message and Media is the name of the political consulting firm associated with Axelrod.

that firm's consulting services that could be fairly characterized as an "infomercial."   Id. Moreover, the *Believer* excerpt, a two-page passage in a 488-page book, does not share the same obvious, promotional purpose in attracting new customers, as did the business website in Gensler that solicited potential clients to pay for architectural design services.   Gensler, 764 F.3d at 736. Even when viewed in the light most favorable to Keel, the passage is not an obvious promotion for Axelrod's political consulting services akin to the unauthorized use of a trademarked name in a prominent location, such as the front cover of a magazine, or in the domain name for a business website.   See Kelly-Brown, 717 F.3d at 306; See Bosley, 403 F.3d at 677 (citing Nissan, 378 F.3d at 1006).

*Believer* is comparable to the expressive political blog post in Farah, which was found to fall outside the scope of the Lanham Act.   See Farah, 736 F.3d at 537–41.   Though the *Believer* excerpt, when considered in isolation, may not convey Axelrod's political views on a particular issue, Axelrod does express his political views at length in other sections of his book, for example in the context of healthcare reform.   (See Ex. 7, Chapter 25, "Why We Do The Work," at 369–89.)   In short, the *Believer* excerpt is more akin to a narrative of an event in Axelrod's career.

A "reverse passing off" claim under §1125(a) of the Lanham Act also requires an allegation of fact that the defendant misrepresented the origin of goods or services while engaging in a clear, promotional use.   Addressing the threshold "commercial use" requirement, Keel alleges:

> Axelrod has and continues to vigorously promote and market *Believer* through book-signing events and dozens of interviews with national and local media. Although he describes *Believer* as a "political memoir," Axelrod plainly also intended the book to provide advertising for promoting his political consulting business which Axelrod, upon information and belief, continues to actively pursue.

(Compl. ¶ 41.)   Aside from this conclusory statement, Keel alleges no further facts in the complaint showing that Axelrod's purpose for writing *Believer* was to promote his political consulting services.

Apart from what is referenced above, there are no other facts that link the publication of *Believer* to the promotion of Axelrod's consulting services.  (Compl. ¶ 41.)  Keel has not alleged that Axelrod solicited or obtained new clients at the book signing events, nor has he alleged that Axelrod has spoken publicly about any business motivations he might have had for writing *Believer*.  Keel's conclusory, unsupported statement that Axelrod "plainly" intended to use *Believer* as a marketing tool for his political consulting services stands in stark contrast to the plausible facts alleged in <u>Valley Forge</u>, where the plaintiffs stated that the "defendants transmitted an e-mail to 4,000 individuals that promoted [the] [d]efendants' alumni services," showing the "[d]efendants' statements proposed a commercial transaction as opposed to some other type of speech."  <u>Valley Forge</u>, 24 F. Supp. 3d at 455 (internal citations omitted).

In short, Keel alleges nothing beyond the fact that Axelrod attended book signings to sell books.  (<u>See</u> Compl. ¶ 41.)  If attending book signings alone were factually sufficient to plead a "reverse passing off" claim, any number of authors could be held liable under the Lanham Act as commercial promoters or advertisers for mischaracterizations or embellishments of past services in their books.  Requiring this degree of accuracy in crediting strategies, ideas, and/or services mentioned in a larger expressive work is the "search[ing] for the source of the Nile and all its tributaries" that the Supreme Court unequivocally stated is not required by the Lanham Act.  <u>See</u> <u>Dastar</u>, 539 U.S. at 35–36.

The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully."  <u>Iqbal</u>, 129 S. Ct. at 1949 (2009) (quoting <u>Bell Atlantic Corp</u>, 550 U.S. at

570).   Keel's "reverse passing off" of services claim fails for failure to plead a plausible fact

showing Axelrod intended the *Believer* excerpt to promote his political consulting services.

## IV.   CONCLUSION

For the above reasons, Defendants' motion to dismiss is granted.[10]   An appropriate Order

follows.

---

[10] Keel's claims against Penguin are predicated on theories of vicarious and/or contributory liability, and are thus contingent on Keel stating a valid "reverse passing off" claim under the Lanham Act.  Because Keel has failed to state such a claim, Penguin is also dismissed from this lawsuit.